UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHANA D. RICHARDSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:11-cv-01002-DML-TWP |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | |
| Defendant. | |

## Entry on Judicial Review

Plaintiff Shana D. Richardson applied for Disability Insurance Benefits (DIB) and Supplemental Security Income disability benefits (SSI) on May 24, 2007, alleging that she has been disabled since September 12, 2002, because of narcolepsy, obesity, migraines, a ventricular septal defect, sleep apnea, seizures, and a learning disability.[1] (*See* R. 103). Ms. Richardson's applications were denied on initial review. She requested reconsideration, stating that she also is afflicted with cataplexy, major depression with psychotic features, a panic disorder, intermittent explosive disorder, and a heart murmur. (R. 108). Her applications were denied on reconsideration (R. 109-116), and she requested an administrative hearing. Acting for the Commissioner of the Social Security Administration, an administrative law judge ("ALJ"), after a hearing held November 17, 2009, determined that Ms. Richardson is capable of performing a modified level of sedentary, simple, and unskilled work that requires only superficial contact

---

[1] Two programs of disability benefits are available under the Social Security Act: Disability Insurance Benefits under Title II for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 423 *et seq.*, and Supplemental Security Income disability benefits under Title XVI for uninsured individuals who meet income and resources criteria, 42 U.S.C. § 1381 *et seq.*

with the general public, co-workers, or supervisors. (R. 27). Crediting the testimony of a vocational expert, the ALJ found that Ms. Richardson's RFC permits her to perform the job requirements of an assembler, machine operator, and hand packer—jobs that exist in significant numbers in Indiana. Accordingly, the ALJ found that Ms. Richardson is not disabled.

The national Appeals Council denied review of the ALJ's decision, rendering the ALJ's decision for the Commissioner final. Ms. Richardson filed this civil action for judicial review under 42 U.S.C. § 405(g), which governs judicial review of the Commissioner's final decisions for both DIB and SSI claims. The parties consented to this magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Ms. Richardson asks the court to reverse the ALJ's decision and award benefits, or to remand for further proceedings, on the grounds that the ALJ's determinations at steps three and five of the familiar sequential analysis are not supported by substantial evidence. She attacks only the ALJ's evaluation of her mental impairments, and her arguments are built around a central theme that the ALJ failed properly to analyze medical evidence of schizophrenia or other psychosis. She also faults the ALJ's discussion of her depression and social dysfunction.

For the reasons discussed in this entry, the Commissioner's decision is AFFIRMED.

## Standard for Proving Disability

To prove disability, a claimant must show that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] Ms. Richardson is disabled if her impairments are of such severity that she cannot perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis about whether the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to all the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to

---

[2] The court's citations to the Social Security Act and regulations promulgated by the Social Security Administration are those applicable to DIB. For SSI disability benefits, materially identical provisions appear in Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq,* and at 20 C.F.R. § 416.901 *et seq.*

do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her age, work experience, and education (which are not considered at step four), and her RFC; if so, then she is not disabled. The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 416.960(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands that there be more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). This limited scope of judicial review follows the principle that Congress designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (internal citations omitted). *See also Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000) (court reviews record as a whole, but does not substitute its judgment for the ALJ's judgment by reweighing evidence, or resolving conflicts, or reconsidering the facts or witness credibility). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of this conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel,* 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir. 1996).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). If an ALJ concludes that benefits should be denied, he must have first built an accurate, logical bridge between the evidence and his conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). The ALJ need not address every piece of evidence in his decision, but he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## The ALJ's Findings

Ms. Richardson was born in June 1986, was 16 years old at the time of the alleged onset of disability on September 12, 2002, and was 24 years old at the time of the ALJ's decision on July 20, 2010. She has a high school education. At step one, the ALJ found that Ms. Richardson has no work history at the level of substantial gainful activity. (R. 14). At step two, the ALJ found that Ms. Richardson suffers from numerous severe physical and mental impairments: a heart defect, narcolepsy with cataplexy and an overlay of mild sleep apnea, obesity, borderline

5

intelligence, depression, panic disorder, and personality disorder, but that none of her impairments met or medically equaled a listing. (R. 14-15). Ms. Richardson does not challenge the ALJ's evaluation of her heart defect, narcolepsy with cataplexy and mild sleep apnea, or obesity, or his findings that these impairments alone or in combination do not meet the criteria of any listings, and are either effectively controlled by medication or do not interfere with Ms. Richardson's ability to perform a modified range of sedentary work.

To apply steps four and five, the ALJ determined that Ms. Richardson is capable of performing a modified range of sedentary work, and that her mental impairments must be accommodated by limiting work to that requiring no more than simple, repetitive tasks with only superficial interaction with the general public, co-workers, or supervisors. (R. 27). At step four, the ALJ found that Ms. Richardson had not engaged in any past relevant work. At step five, he determined that there are a significant number of jobs in the relevant economy that Ms. Richardson can perform consistent with her RFC and, thus, she was not disabled at any time between September 12, 2002, and the date of the decision.

Ms. Richardson's appeal focuses on the ALJ's evaluation of her mental impairments. She argues that the ALJ erred at step three because: (a) the ALJ failed specifically to mention listing 12.03C; (b) the medical evidence proved that her mental impairments met or equaled listings 12.03C or 12.04; (c) the ALJ erred by deciding whether Ms. Richardson met or equaled a listing without the advice at the hearing of a psychologist; and (d) the ALJ failed to address evidence inconsistent with his findings and improperly discounted the opinions of Ms. Richardson's treating physician. Ms. Richardson also challenges the ALJ's residual functional capacity assessment and the ALJ's negative credibility determination.

**Analysis**

**A.      The ALJ made detailed findings regarding Ms. Richardson's mental impairments.**

We first discuss the ALJ's findings regarding Ms. Richardson's mental impairments to give context to Ms. Richardson's arguments that the ALJ erred in his evaluation. The ALJ's overall impression was that Ms. Richardson's self-reports to mental health practitioners were "quite inconsistent" with each other, "very much exaggerated," and "scarcely corroborated by the clinical record." (R. 22). He did not, as Ms. Richardson contends, ignore or reject evidence without any basis. Instead, his decision reflects a careful study of Ms. Richardson's mental health evaluations and treatment and his comparison of Ms. Richardson's self-reports to her actual day-to-day activities and social functioning. After the administrative hearing—at which Ms. Richardson reported severe psychological symptoms—the ALJ ordered a new mental health examination and she was administered the Minnesota Multiphasic Personality Inventory.

The ALJ's discussion of the medical evidence regarding Ms. Richardson's mental health began with the record of the first time Ms. Richardson received any psychological evaluation, which was on August 23, 2007, when she was seen by a state agency consultative psychologist (Dr. Jason Hankee) at the behest of the Social Security Administration. Dr. Hankee administered the Wechsler Adult Intelligence Scale-Third Edition test, and noted Ms. Richardson's borderline range of intellectual functioning. Dr. Hankee described his observations of Ms. Richardson's behavior and Ms. Richardson's report to him that she had attempted suicide more than 30 times in the previous year. She then explained to Dr. Hankee that she was trying to numb her pain and not trying to kill herself, had never been hospitalized because of a suicide attempt, denied she currently was thinking about suicide, and stated that she was not in therapy. (R. 468). Ms. Richardson also told Dr. Hankee that she had a friend named "Shanika" that only she can see and

hear, and has been friends with Shanika for three years. Dr. Hankee asked Ms. Richardson to start mental health treatment. (*Id.*).

Ms. Richardson began mental health treatment on October 31, 2007, at Midtown Community Mental Health Center. The ALJ addressed Ms. Richardson's descriptions to Midtown of her mental health issues, including auditory and visual hallucinations of a friend named "Emily" with whom she talks to sometimes, a history of self-mutilation by cutting which she stopped about a year before, a history of intermittent panic attacks occurring two to three times per month, and a history of intense anger accompanied by physical aggression against herself, others, and property.

The ALJ compared and contrasted these two mental health evaluations, particularly her identification of her imaginary friend as Shanika to Dr. Hankee but as Emily to Midtown. He doubted Ms. Richardson's self-reports of the extraordinary number of suicide attempts, the history of self-mutilation, and violence toward others because there was no medical evidence of psychiatric or medical treatment, no hospitalizations for mental health reasons, and no clinical observations in any of her medical records consistent with self-mutilation. (R. 22). The ALJ further stressed that Ms. Richardson's grandmother, with whom she lives, did not corroborate allegations of multiple suicide attempts, self-mutilation, extreme and violent anger, or psychotic hallucinations of imaginary friends. Instead, the grandmother stated she was not aware of any bizarre behaviors, and she acknowledged that Ms. Richardson did not exhibit abnormal behavior in public. (R. 23).

Ms. Richardson was next seen for mental health treatment at Midtown in December 2007, by Dr. Nurnberger, who had a 20 minute visit with Ms. Richardson. (R. 551). His notes report that Ms. Richardson has a history of hearing voices "several days at a time for more than

8

the past year," that she has auditory hallucinations of a friend named Emily, and sometimes has the feeling she is being followed, has panic attacks, and a has history of substantial anger problems. (R. 551). Based on this visit, Dr. Nurnberger stated his medical impression was "probable schizophrenia." (*Id.*). Dr. Nurnberger saw Ms. Richardson next on February 25, 2008 (R. 557), a third time on March 24, 2008 (R. 562), and a fourth time on August 25, 2008 (R. 570). These three records state that Dr. Nurnberger's medical impression is "schizophrenia." Dr. Nurnberger's notes for the February and March 2008 visits discuss behaviors like those reported in December 2007 (hearing a voice but no commands to do anything, and trouble controlling anger), and the third note does not describe any behaviors. The ALJ highlighted that "Midtown therapists . . . form[ed] a diagnosis of 'probable' schizophrenia," and explained why he gave no weight to the diagnosis: the lack of indications of psychosis otherwise in the medical records; Ms. Richardson's over-reporting of her psychological symptoms, on which the diagnosis appeared to be based; and the relatively modest clinical signs and findings elsewhere in the record.

   In support of these criticisms of the Midtown reports of schizophrenia, the ALJ particularly emphasized a report by psychologist Herbert Henry, who was asked to evaluate Ms. Richardson after the administrative hearing. He saw Ms. Richardson on January 17, 2010, for a mental status examination, and administered the MMPI-2 (the Minnesota Multiphasic Personality Inventory) and the WAIS-III (intelligence evaluation). (R. 598). Dr. Henry concluded—a finding emphasized by the ALJ—that the personality profile from the MMPI "is invalid due to overreporting her symptoms." (R. 605). Dr. Henry also observed—another finding highlighted by the ALJ—that because Ms. Richardson initially claimed to be unable to read the test instructions, he played the test questions from an audio tape, but at item 356, Ms.

9

Richardson "decided to stop the tape and she stated that she was able to read the test questions and she could complete the inventory faster by reading questions herself than listening to the tape." (*Id.*). This information suggested to the ALJ, once again, that Ms. Richardson exaggerates in her self-reporting of deficiencies.

Dr. Henry's report also describes numerous conversational exchanges between himself and Ms. Richardson. Ms. Richardson told Dr. Henry that she had two imaginary friends—Emily *and* Shanika. (R. 601). His report includes his observations of Ms. Richardson's appearance and demeanor, and his conclusions—while acknowledging the earlier report from Midtown of probable schizophrenia—that Ms. Richardson did not present as a psychotic person and the psychotic symptoms she described for herself were not ones that interfered with her ability to perform daily activities or to interact appropriately in social situations. (R. 598-603, 606). Dr. Henry found that Ms. Richardson was alert, had an affect within normal limits, and had thought processes that were goal-directed and coherent. (R. 600).

Based on the overall record, the ALJ concluded that Ms. Richardson's mental impairments interfered only mildly in her activities of daily living, and moderately in social functioning and in maintaining concentration, persistence, or pace. He also concluded that she had not experienced any episodes of decompensation. (R. 24).

B. **Ms. Richardson has not met her burden of demonstrating that her mental impairments met any listing.**

Ms. Richardson argues that the ALJ erred by failing to find that the medical evidence of her psychiatric treatment and evaluation proved her impairments met or medically equaled listings 12.03C and 12.04. She also faults the ALJ for not even mentioning listing 12.03, and contends this failure independently requires reversal of the ALJ's decision. The court disagrees with both arguments.

First, as to listing 12.03, the ALJ did not ignore the evidence Ms. Richardson relies upon to meet subparagraph C of this listing. Listing 12.03 is titled "schizophrenic, paranoid and other psychotic disorders." A person whose "psychotic features with deterioration from a previous level of functioning" are manifested in the following signs and symptoms meets the criteria of 12.03C, and is presumptively disabled. *See Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002):

> 12.03C Medically documented history of chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ found that Ms. Richardson did not have a medically documented history of chronic schizophrenic or other psychotic disorder; thus, his findings necessarily rejected the criteria under listing 12.03C. The ALJ gave *no* weight to the reports by Midtown Mental Health diagnosing schizophrenia and relied instead on Dr. Henry's more recent evaluation that Ms. Richardson is not a psychotic individual and that the psychotic symptoms she reported do not affect her abilities to perform work, accomplish daily living activities, or interact appropriately in social settings.[3] To the extent the ALJ's decision to credit Dr. Henry's medical opinion and

---

[3] Ms. Richardson complains that the ALJ cherry-picked the medical evidence regarding schizophrenia because he mentioned only Midtown's first record of Dr. Nurnberger's impression of "probable schizophrenia" and did not mention the later records that record Dr. Nurnberger's impression as "schizophrenia." The court disagrees. Dr. Nurnberger's visit notes rely on the same self-reported behaviors for both his "probable schizophrenia" and "schizophrenia" medical impressions. The ALJ thoroughly explained his reasoning for rejecting the diagnosis of "probable schizophrenia" and "other indications of 'psychosis,'" and his reasoning for accepting

reject Midtown's is supported by the record, the ALJ's failure to specially mention listing 12.03 was not error. *See White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005) (where ALJ's finding that there was no documentation of certain medical disorder was supported by substantial evidence, there was no reason for ALJ to consult listing requirements for that medical disorder).

      The court finds the ALJ could, consistent with the record and SSA regulations, determine that Dr. Henry's mental health evaluation was entitled to significant weight and Midtown's diagnosis of schizophrenia was not entitled to weight. The physician at Midtown whose notes diagnose schizophrenia saw Ms. Richardson only four times over an eight-month period between December 2007 and August 2008, and three of those visits lasted 20 minutes. (The other lasted 40 minutes.) (R. 551, 557, 562, 570). Because of the limited interaction over a short time, the physician was not a treating source whose medical opinions were entitled to controlling weight. A physician or clinician whose treating relationship with the claimant is so sparse is, by definition under the SSA's regulations, a non-treating source. *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005); 20 C.F.R. § 404.1502 ("Nontreating source means a physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you"). Dr. Henry similarly was a non-treating source, and the ALJ adequately explained why he found Dr. Henry's mental health evaluation more persuasive. He pointed out that Dr. Henry's evaluation was consistent with the evidence as a whole (including Ms. Richardson's wide-ranging abilities to attend to daily living activities, her ability to socialize with friends and family and regularly attend church, and her grandmother's reports regarding Ms. Richardson's daily living and social functioning) and that Midtown's diagnosis was based primarily on Ms.

---

Dr. Henry's medical evaluation, instead, of the same kinds of behaviors that underlay Dr. Nurnberger's medical impression.

Richardson's self-reports which, the evidence showed or at least could be rationally interpreted to show, she exaggerates.[4]

The ALJ's opinion that Ms. Richardson did not suffer from schizophrenia or other psychotic disorder reflects his weighing of the evidence and his determination of the weight to give to medical opinions within the record, consistent with his responsibility under the SSA's regulations. *See* 20 C.F.R. § 404.1527(d) (ALJ has responsibility to evaluate and decide weight to give medical opinions). His decision that Ms. Richardson did not suffer from schizophrenia or other psychotic disorder is supported by substantial evidence.

Listing 12.04 is titled "affective disorders," and encompasses mental health impairments characterized by mood disturbance, including depression. The ALJ evaluated Ms. Richardson's mental health evaluations and symptoms against listing 12.04, including its B and C criteria. He found neither was met. Ms. Richardson asserts that the evidence proved she met the B criteria for listing 12.04 because she is schizophrenic which, according to Ms. Richardson, necessarily means she is markedly limited in her social and occupational functioning.[5] The court must reject this argument. First, the ALJ's determination that Ms. Richardson is not schizophrenic was supported by substantial evidence, as addressed above. Second, Ms. Richardson has not shown that the evidence *required* the ALJ to conclude that Ms. Richardson's depressive symptoms and other mood disturbances (including Ms. Richardson's alleged hair-

---

[4] As pointed out by the ALJ, Ms. Richardson's grandmother with whom she lived did not corroborate any of the serious manifestations of poor mental health described by Ms. Richardson. She did not corroborate witnessing suicide attempts (let alone the multiple and frequent attempts described by Ms. Richardson), or self-mutilation, or extreme and violent anger, or hallucinations of imaginary friends. Indeed, the grandmother told Dr. Henry that she did not know of any unusual or bizarre behaviors. (R. 23, citing R. 599).

[5] Ms. Richardson's reply brief argues that the C criteria for 12.04 also were met. This argument, presented for the first time in a reply brief, is waived. (*See Waite v Bowen*, 819 F.2d 1356, 1360 n. 1 (7th Cir. 1987) (refusing to consider new argument in reply brief in appeal of adverse disability determination).

trigger temper and violence toward others) manifested themselves in a manner satisfying the B criteria.  To satisfy the B criteria, a claimant's mental disorder must result in at least two of the following:  marked restriction of activities of daily living, marked difficulties in social functioning, marked difficulties in maintaining concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration.   "Marked" means "more than moderate but less than extreme."  Listing 12.00C (Assessment of level of severity). The regulation explains further that a "marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.*

  The ALJ's finding that Ms. Richardson is only mildly restricted in her activities of daily living is supported by substantial evidence.  His decision provides numerous details regarding these activities.  *See* R. 21, 24 (no significant problems with self-care or performing chores; enjoys reading and using a computer; can cook, clean, do laundry, and shop without assistance). He found her only moderately limited in social functioning, and explained that he credited her grandmother's descriptions of Ms. Richardson's socializing at church, going out to dinner, regularly spending the nights with her sisters and mother, and generally being able to get along with others, though noting her past problems with interacting with authority figures.  The ALJ also explained why he discredited as exaggerated Ms. Richardson's reports of constant fights with her sisters and other repeated episodes of violence against herself, others, and property.  His decision that these reports were exaggerated because there was no corroborating evidence—such as clinical findings, records of school discipline, arrest records—that might be expected given the significant and serious injuries Ms. Richardson claimed to have inflicted on herself and

14

others is a rational one.  The ALJ did not ignore the evidence of Ms. Richardson's explosive reactions to events; rather, he discussed it and discredited it as unworthy of belief.  The ALJ also addressed head-on the evidence Ms. Richardson claims should have convinced him to find it markedly, and not just moderately, difficult for her to maintain concentration, persistence, or pace.  The ALJ addressed Ms. Richardson's intellectual functioning—in fact, she had been administered the Wechsler Adult Intelligence Test twice for purposes of evaluating her disability claims, once in 2007 and again in 2010—and acknowledged that she had been enrolled in special education classes while in school.  His decision addresses the strength of her mental functioning based on the psychologists' reports, and his acceptance of Dr. Henry's assessment that she could perform unskilled, simple job tasks.  Finally, the ALJ did not ignore the suicidal attempts or ideation Ms. Richardson testified about or reported to mental health providers.  Again, he addressed this evidence and described why he found it unworthy of belief and exaggerated.  His evaluation of this evidence is not without a rational basis in the evidence.

Thus, the court must disagree with Ms. Richardson that the ALJ erred in finding Ms. Richardson's mood disorders did not meet or medically equal the B criteria for listing 12.04.

### C. **The ALJ was not required to summon a medical advisor.**

Ms. Richardson's argument that the ALJ was required to summon a medical advisor to the hearing to opine whether a listing was met or medically equaled, or whether Ms. Richardson otherwise was disabled is without merit.  She cites two cases in support of her argument, but neither *Barnett* nor *Green* (discussed below) establishes a rule that an ALJ must always summon a medical advisor regarding medical equivalence to a listing or any other disability-related determination.  In *Green v. Apfel,* 204 F.3d 780 (7th Cir. 2000), the court said that an ALJ is

required to summon a medical expert only "if that is necessary" to make an informed decision regarding whether the claimant is disabled, at step three or otherwise. *Id.* at 781.

In *Barnett v. Barnhart,* 381 F.3d 664 (7th Cir. 2004), the ALJ's opinion whether the claimant was disabled at step three contained two sentences regarding the listing of impairments and did not identify any particular listing he considered. The court found that the ALJ had made only a perfunctory analysis of the listing and had refused to consider an entire line of medical records documenting her symptoms and treatment for seizures over a 10 year period. Further, there was nothing in the administrative record showing that any physician had ever considered whether the claimant's impairments met or equaled a listing, the ALJ did not consult a medical expert to make that judgment, and it therefore appeared that "the ALJ merely assumed the absence of [medical] equivalency without any relevant discussion." *Id.* at 670-71. Under those circumstances, the ALJ's decision at step three was not supported by substantial evidence. *Id.* at 671.

The ALJ's opinion in Ms. Richardson's case and the administrative record bear no resemblance to the facts in *Barnett*. This ALJ identified the listings he considered, and he discussed in detail his analysis of the medical records and the reasons he found that Ms. Richardson did not meet or equal any listings. He also addressed Ms. Richardson's schizophrenia and the reasons he rejected that diagnosis, as well as her self-reports of severe troubling behavior (self-mutilation, repeated violence to others and things, suicide attempts, and different imaginary friends). Further, the administrative record reflects that agency physicians had opined that Ms. Richardson's physical and mental impairments did not satisfy, or medically equal, any listings. One of these opinions (R. 508) was rendered based on an administrative record that included Midtown's diagnosis of "probable schizophrenia." Thus, an agency

16

physician took into account medical evidence of the behaviors Ms. Richardson claims required a finding that she met a listing. Furthermore, after the administrative hearing, the ALJ gathered more evidence regarding Ms. Richardson's mental impairments and ordered a second psychological consulting examination. The ALJ obtained from Dr. Henry (and submitted to Ms. Richardson's attorney for comment) a detailed report evaluating Ms. Richardson's mental status and her intellectual functioning, and his conclusion that she was not psychotic. The ALJ learned that the results of an MMPI administered to Ms. Richardson were invalid because Ms. Richardson over-reported her systems. Under these circumstances, and in light of the ALJ's thorough evaluation of the mental health records, the court will not find error in the ALJ's decision not to summon additional medical evidence. *See, e.g., Thomas v. Astrue,* 2010 WL 2485556 (S.D. Ind. June 11, 2010) (ALJ does not err in failing to summon medical expert on equivalence where there is no showing that the ALJ disregarded pertinent medical evidence contrary to his conclusions or failed to adequately explain how he reached the decisions he did).

### D. The ALJ's credibility determination is not "patently wrong.

In analyzing Ms. Richardson's mental impairments, including with respect to the listings and their effects on her functioning, the ALJ considered whether and the extent to which Ms. Richardson's descriptions of the limiting effects of her impairments were worthy of credence. His assessment of Ms. Richardson's credibility is entitled to special deference from the court and is not a ground for reversal and remand unless it was "patently wrong." *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008) (because ALJ is in best position to evaluate a claimant's credibility, ALJ's credibility determination is reviewed deferentially and will not be set aside unless it is "patently wrong"). Social Security Ruling 96-7p describes the appropriate process for evaluating credibility and requires an ALJ to consider a claimant's subjective complaints in light of the

relevant objective medical evidence, as well as any other pertinent evidence regarding the claimant's daily activities, the severity and intensity of the claimant's symptoms, precipitating and aggravating factors, medication, treatment, and other measures to relieve the person's symptoms and their efficacy and side-effects, and any other factors relevant to functional limitations due to pain or other symptoms. *See* SSR 96-7p; 20 C.F.R. § 404.1529(c)(3). It is not necessary that the ALJ recite findings on every factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers have a fair sense of how the claimant's testimony was assessed. *Brindisi v. Barnhart,* 315 F.3d 783, 787-88 (7th Cir. 2003) (ALJ must comply with SSR 96-7p in making a credibility determination by articulating the reasons behind the determination).

    Ms. Richardson attacks the ALJ's credibility determination on the grounds that he refused to accept the diagnosis of schizophrenia, "ignored or rejected" the evidence that corroborated her allegations, and failed to cite any evidence in support of his credibility decision. Ms. Richardson's arguments are not supported by the record. As discussed above, the ALJ was not required to accept the diagnosis of schizophrenia, and he provided a rational basis for rejecting the diagnosis. His decision contains a detailed evaluation of the evidence and provides numerous examples of the ways in which he found Ms. Richardson's descriptions of the effects of her mental health problems as inconsistent with other record evidence and unworthy of belief. The ALJ addressed Ms. Richardson's and her grandmother's statements; Ms. Richardson's activities of daily living; her treatment history; significant improvement of symptoms (particularly related to cataplexy, social functioning, control of panic attacks, and anger management) when she takes her medication; her noncompliance with her medication regimen (which the ALJ found was not because of an inability to pay or because her mental illness

prevented her from taking medication—findings that have support in the record); the results of consultative examinations; the invalid results of the MMPI because she over-reports her symptoms; and other examples of exaggerated self-reporting. His credibility determination cannot be characterized as perfunctory, as Ms. Richardson asserts.

There is no basis on which the court can find that the ALJ's assessment of Ms. Richardson's credibility was patently wrong.

### E.  **Substantial evidence supports the ALJ's evaluation of Ms. Richardson's RFC.**

Ms. Richardson's argument regarding the ALJ's evaluation of her RFC is perfunctory, stating broadly that the ALJ omitted the limitations caused by her "quite severe schizophrenia and depression with psychotic features." These arguments were addressed above. The ALJ's decision contains a detailed look at Ms. Richardson's mental health records, her self-reports, and mental health evaluations. As the court has found, the ALJ's evaluation of that evidence has a rational basis and is supported by substantial evidence. This court must therefore defer to the ALJ's findings. The ALJ's decision that Ms. Richardson is capable of performing a modified level of sedentary, unskilled, and simple work, requiring only superficial interaction with others, took into account the mental impairments and their limiting affects that the ALJ found supported by the evidence. His finding, based on the VE's opinion, that significant numbers of jobs are available accommodating Ms. Richardson's RFC is also supported by the record.

## **Conclusion**

The ALJ's decision that Ms. Richardson is not disabled is supported by relevant evidence that a reasonable person might accept as adequate to support his conclusions. Accordingly, the Commissioner's decision is AFFIRMED.

So ORDERED.

Date: 09/26/2012

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com